## UNITED STATES HAT MACHINERY CORPORATION v. BOESCH MFG. CO., Inc.
### No. 120.

Circuit Court of Appeals, Second Circuit.
Dec. 26, 1939.

Vernon M. Dorsey, of Washington, D. C., and T. Clay Lindsey and George N.

Robillard, both of Hartford, Conn., for appellant.

Blair, Curtis, Dunne & Hayward, of New York City (Robert S. Blair, Daniel L. Morris, and John C. Blair, all of New York City, of counsel), for defendants-appellees.

Before L. HAND, CHASE, and PATTERSON, Circuit Judges.

L. HAND, Circuit Judge.

The appeal is from a decree holding invalid and not infringed Patent No. 1,-533,351, issued to Homer A. Genest. The invention was for "felting, shrinking and crozing" felt hat "bats". "Bat" is the name for the felt fabric out of which hats are made; felt is rabbit fur, the separate hairs of which, when agitated in hot water, congeal, as it were, into a seamless fabric. At first this is very flimsy and must be handled with great care, but, as the barbs upon the hairs interlock more and more completely, it becomes more closely knit and stouter. This process is called the "hardening" stage; it always was and still is done by hand. Then follows an initial "shrinking" stage, at the end of which the "bat" is a fur cone, tough and hard, but still too big; this stage too has always been manual. The final stage is called "sizing"; it consists of still further shrinking the "bat" till it gets to the proper size for a hat; it is the most troublesome of all, and with it the patent is concerned. Although all the claims in suit are for a method, they are not intelligible except in terms of the machine disclosed. It consists of a knuckled belt supported by power driven "guide rolls", set at substantial intervals, between each pair of which another roll is hung from above and set below the line of the "guide rolls"; these are the "deflecting rolls". When "hardened" and "shrunk" "bats" are laid upon the belt, they will pass down and between the belt and the "deflecting rolls", and up and over the "guide rolls" in a sinuous course, which is called the "to and fro" movement, and this, coupled with an agitation transversely to, and in the plane of, the belt, is the practical equivalent of hand "sizing". The machines are driven fast, the rolls are numerous, and the "bats" are put through them several times in different positions to the line of the belt. This is all that is necessary for the "sizing" of flat pieces of felt. However, "bats" are cones, as we have said, and therefore have two folds, when laid flat, as they must be; and when the folds pass through "deflecting rolls" they become creases which show in the finished hat. Indeed, even in the hand process the workman from time to time must open out the "bat" and fold it in a new line; this is called "crozing".

The claims in suit, 10, 14 and 19, are especially directed towards automatic "crozing", which the machine accomplishes in the following way. On each side of each "deflecting roll" is a so-called "pressure roll", which presses upon the belt at a point just above a "guide roll", so that the belt is grasped between the two. These "pressure rolls" may be idlers, or driven like the "guide rolls", and when driven they must be at a slower speed. (Page 4, lines 34, 35.) It is the driven form which the defendants have adopted. When the "bat" reaches the first of the "pressure rolls" the approaching edge lifts the roll against the pressure of the spring, and there develops a little "ripple", "tuck" or "wave" in the upper ply, because the belt has a stronger grip upon the lower ply than the lower ply has upon the upper. As the bat moves through the machine, this "wave", "ripple", or "tuck" passes from the entering edge of the "bat" along the whole upper ply till the "bat" passes beyond the "pressure roll"; the "wave" is always just behind that roll, and when it reaches the further edge of the "bat", it follows around the fold, making a new fold upon a slightly different line; what was before the fold becomes a part of the lower ply. Each "pressure roll" adds its increment to this process, and the "bat" is "crozed" at the same time that it is "sized", which merely means that the fold is changed progressively, so that at each grip between "guide" and "pressure rolls" there shall be a new fold.

Since at least 1854 the art had known an automatic "sizing" machine, called the "multi-roller" (Cowper's British patent No. 1795 of that year). This was made of two banks of rolls, one above the other, each roll touching, or nearly touching, its neighbor of the same bank, and always touching under pressure two neighboring rolls of the opposite bank, for the banks were so set that the rolls in opposite banks were staggered. As both banks were positively driven at the same speed, when a "bat" was put through the machine, although it was effectively "sized" by kneading it "to and fro" in a sinuous course, it

came out with the fold just where it had been when it went in; each passage between the bite of two rolls helped to form a crease; it was not "crozed". There is some evidence that at times the driving belts on the rolls of these machines would get loose, and the two banks would vary a little in speed so that the "bats" came out "mussed". That was thought a disadvantage, and was never regarded as "crozing"; and it was always necessary for a workman to take the "bats" after one or more runs, and "croze" them by hand, so as to prevent repeated runs on the original fold. This was troublesome and expensive. In 1910 two inventors, Stocker and Stacy, invented an elaborate machine, and applied for a patent upon it, which issued five years later—Patent No. 1,156,949,—and which was intended to "size", "shrink" and "croze" at the same time. The defendants argue, and the judge found, that the method of this machine was an anticipation of the claims in suit. In it the "bat" was held between an upper and a lower segmental plate, revolving in opposite directions. Were it not that the operating faces of these plates had "the slats, 40", upon them, it would have been plain beyond question that the machine was not intended to operate like Genest's. The plates touched the upper and lower plies of the "bat" at every point, and would allow no slack, ruffle, "tuck", "wave" or "ripple" to gather upon either top or bottom. If the machine was operative at all—none was ever built—the "bat" was rolled upon itself quite like a caterpillar tractor; and that this was in fact the conception, is indubitably shown by figure 9, which disclosed a flat triangular plate, to be inserted in the "bat", "around which the body may roll instead of having its inner sides rubbing directly against each other" (page 3, lines 8-11). The defendants argue that the presence of "the slats, 40", on the faces of the plates necessarily set up "waves" or "ripples" in the plies, but that is nowhere suggested, and is at best much too doubtful to serve as an anticipation. Indeed, it seems pretty plain that when a plate passed across a ply, it did not slide upon it at all; but that the end of the plate caught the edge of the ply and simply pulled it along, the joint surface of contact becoming greater and greater until the plate began to leave the ply at the other edge of the "bat". While this was going on, the only slip was between the inner surfaces of the two plies, the "bat" acting as an endless belt. This is apparently a practicable method of "shrinking", "sizing" and "crozing", but it is not the plaintiff's method, and we cannot agree with the judge in regarding it as an anticipation.

With this reference out of the way, the patent in suit has the conventional earmarks of validity. The art had gone for many years without automatic "crozing", during all of which the need for it had existed; there had been at least one effort which was of another type and did not—then at any rate—go into use; the invention, when made, was a successful answer and has been widely used. It is true that in the plaintiff's commercial machine the "crozing" takes place, for part of the run, in the patented way, and for the rest between two belts which apparently hold the plies flat like the plates in Stocker and Stacy's machine. It is also true that a greater amount of "crozing" takes place between the belts than by the patented method, and that it is in the opposite direction. We do not see, however, that this makes a great difference. "Crozing" is merely changing the position of the fold; taken by itself, it has no value whatever; it merely prevents the "sizing" from injuring the hat. The amount of the croze is not important, so long as there is enough to avoid making a deep crease; and the fact that the "bats" are "crozed" in opposite directions is utterly insignificant. That the plaintiff uses both methods does indeed show that the patented way has not supplanted all others; but it does not show that it is not a good way, and the defendants' use of it proves that they at any rate think it is a very good way. We conclude that the patent is valid.

All the defendants did to the old "multi-roller" machine in order to make their machine was to set one bank —the upper—at a slightly greater speed (8%) than the lower, and to keep the two banks about one-twelfth of an inch apart. The difference in speed was alone enough to "croze" the "bats", though the total slip was only about half an inch in two compartments of twelve rolls in each bank. Since this "crozing" is incremental, each increment was therefore only about one-fiftieth of an inch; and it would not be surprising if "tucks", "ripples" or "waves" in the lower and slower ply could not be detected in a moving photograph. Nevertheless, the plaintiff attempted to prove that such a machine would produce visible

"waves". They built one after the defendants' own specifications and the moving photographs showed larger "tucks" or "waves" in the lower, than in the upper, ply. The defendants complain that that machine did not conform to their directions, particularly in that the spacing between the upper and lower banks was not uniform; but we are doubtful whether this would account for the appearance of the "waves" actually seen. To meet this proof, the defendants, who had refused to let the plaintiff inspect the inner construction of their own machine, took off the front of it and photographed its operation. They insist that the change did not affect its operation in any way, and indeed it is a little hard to see why it should have. They further insist that the photographs do not show the "tucks" or "waves" of the patent in suit, and effectively answer the plaintiff's photographs. However, whatever the plaintiff's photographs do, or do not, prove, certainly the defendants' are no answer to the plaintiff's charge of infringement, for, as we have said, it would not be surprising if "tucks" or "waves", plenty large enough for "crozing", were too small to show, or were swallowed up in other deformations of the "bat" on its way through the machine. But though the presence of "waves" in the plaintiff's pictures may possibly be more persuasive than their absence in the defendants', we do not think that in truth either is important, because the conditions of detection were not favorable. We are satisfied for quite other reasons that the defendants do "croze" in the patented way. That in fact they do "croze" is conceded; indeed, they claim it in their advertisements. Moreover, they do not "croze" after the manner of Stocker & Stacy; that is, by holding the "bat" between two plates, or belts, which roll it upon itself like a caterpillar tractor, keeping the plies flat and driving the plates or belts at the same speed. Quite the contrary, they "croze" by running the "bats" between two rolls having a slight differential of speed, exactly as disclosed in the patent; and they build up the eventual "croze" incrementally by a succession of slight changes in the position of the fold as the "bat" passes each bite of two rolls. The important thing is just that; the slight shift of one ply upon the other before each bite, as contrasted with the continuous rotation of the "bat" as a whole, found in Stocker & Stacy. Those were the two, and the only two, ways which the art has devised; and the defendants certainly did not invent a third. It is possible, we believe, to get a notion of what happens in their machine. When both plies are in the very bite of two rolls, they cannot slip over each other; indeed there is apparently a slip of about 25% of the "bat" across the face of the upper rolls on its way through. But there is a period—which must, it is true, be extremely short, but which nevertheless exists—during which the surface of each roll engages its ply before the plies have been locked together by the full bite. During that interval the lower ply is moving at a less speed than the upper, and nothing prevents a slip between the two. A slight creep should take place at that moment, which would be repeated again and again as the folded edge of the "bat" approached each new bite of the rolls. Thus by minute and quite imperceptible increments sufficient "croze" would be built up, and it is impossible to understand how it can otherwise take place. That is an exact duplication of the patented process. It is true that nobody knows just what goes on in the machine, and it is for that reason possible that this account is wrong. Nevertheless, nothing in the record contradicts it and it does explain the fact that the defendants' machine does "croze", and no better explanation is at hand. Even without it we are satisfied that the defendants infringe; the result and the machine are too exactly alike to admit of any doubt, and we are not disposed to stand upon the word, "waves" in claims 10 and 14. Besides, claim 19 does not use it, but speaks of "increments" and certainly the defendants "croze" by increments; if they did not they would have to limit the speed differential to one set of rolls. When all is said, the plaintiff is charged with no more than to establish its case by a preponderance of evidence (Hildreth v. Auerbach, D.C., 223 F. 545, 548, affirmed on opinion below, 2 Cir., 223 F. 651, 652) and we are convinced to that degree and more.

Decree reversed; decree for the plaintiff.